## ANCE ROGERS v. STATE.

No. A-1480.   Opinion Filed May 1, 1913.

(131 Pac. 941.)

1. EVIDENCE—Harmless Error. The admission or exclusion of testimony which, in the light of subsequent developments during the trial, indicates conclusively that no injury did or could have resulted is not ground for reversal of a judgment.

2. TRIAL—Admission of Evidence—Cure of Error. The admission of testimony which is of doubtful competency, and which is afterwards by the court excluded out of an abundance of caution, is not error sufficiently prejudicial to justify a reversal.

3. TRIAL—Severance—Right—Joint   Trial—Evidence—Admissibility.
(a)   When two persons are jointly charged with the commission of an offense against the laws of this state, if such offense is a felony, they are entitled to separate trials if they so demand, as provided by statute.

(b)   When persons who are jointly charged with a felony are jointly tried, testimony which is admissible as to one and inadmissible as to the other is properly admitted, when limited in its effect by instructions from the court to the jury confining it to the particular defendant against whom it is admissible; and this is the rule even though the testimony introduced is such that, were the complaining accused on separate trial, it would have been reversible error to admit the same as against him.

(Syllabus by the Court.)

*Appeal from District Court, Love County;*
*Stillwell H. Russell, Judge.*

Ance Rogers was convicted of murder, and appeals. Affirmed.

*Eddleman & Graham,* for plaintiff in error.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

ARMSTRONG, P. J. The plaintiff in error, Ance Rogers, was tried and convicted at the June, 1911, term of the district court of Love county on a charge of murder, and his punishment fixed by the court at imprisonment for life in the state penitentiary.

A complete synopsis of the testimony was prepared and submitted by the Assistant Attorney General in his brief on behalf of the state, which brief was filed several months before any brief was filed on behalf of the accused, and no objections to its accuracy or fairness have been made or suggested by counsel for the accused. We adopt the synopsis for the purposes of this opinion.

Will Riley, on behalf of the state, testified that he lived at Marietta; was in the cattle business; that he knew Henry Taylor in his lifetime; had known him for four or five years; during part of that time that he had been in this witness' employ; that he was killed on the 10th day of April, 1911, and that at the time of his death he was working for witness; that he knew Ance and Mart Rogers and also their father, R. L. Rogers; that R. L. Rogers lived on Rock creek about four miles west of Marietta, close to the road; that at the time of his death Taylor was batching with one Mike Freeman on witness' farm about a mile north of where Rogers lived; that on the Monday of the killing Taylor was to go about four miles south of Rogers' house down on Rock creek to get a load of corn to feed cattle with; in going down there it was necessary to go by Rogers' house, and also necessary to pass there returning; that the road down to where this corn was kept was right down in the bed of the creek, which runs west of where Rogers lived about 100 yards, running north and south; that there was timber and brush; that the road was within 25 or 30 feet from

the bank of the creek; that there used to be an old road that ran from Rogers' store or residence in a southwesterly direction down towards the creek; this road has been fenced up; that the deceased, Taylor, was a man about 60 years of age, and on the day of the killing was driving a span of mules, one a little iron gray and the other a kind of yellow colored mule; that on the day he was killed he was hauling a load of corn and had on extra side boards on the wagon, and the spring seat necessarily would have been about six feet from the ground. Witness also saw the deceased the next day after the killing, and described the wounds upon his head.

Mike Freeman, for the state, testified that he was 19 years old; that he lived on Will Riley's place six miles west of Marietta; that he knew Henry Taylor during his lifetime; that he was shot on Monday in the early part of April, 1911; that on the Sunday before the Monday on which Taylor was killed, Mart and Ance Rogers and Leonard Hensley came out to where this witness and Taylor were batching—two of them were riding horses and one of them was riding a mule—about 2 o'clock in the afternoon; they came up there and said they had come to straighten about that bridle business; they started to raise a racket and tried to get Mr. Taylor to leave the house, called him vile names, and told him if he would leave the house they would whip him; Ance Rogers said this; he was mad. Taylor refused to go, and Ance told him to meet him down on the creek, and Taylor said, "No;" he would not meet him down there.

"This was about a mile from Rock creek. He had a bridle taken on the Saturday before this, and Taylor had told me that the Rogers boys and Hensley were the only people who were by there the day the bridle was missed, and he had been over to the Rogers house and looked for it before they got out there on that Sunday. This was over a week before the killing. On the day of the killing Mr. Taylor and I went over to feed a bunch of cattle about two miles east of Rock creek, and Mr. Taylor went down on the creek to get a load of corn. He was in a wagon. I went over to the pasture on horseback. I left him

between 8 or 9 o'clock in the morning. In going Mr. Taylor had to pass by Rogers' house and go down the Rock creek road. I went down to where Mr. Taylor went for corn about 12 o'clock that day, but did not see Mr. Taylor. However, I learned that he had been there and left. It was about 2 o'clock that afternoon that I learned of his death."

Hendricks Freeman, for the state, testified that he worked on the ranch of Jim Rose, and was a brother of Mike Freeman; that he was acquainted with the defendants, Ance Rogers and Mart Rogers, and also that he knew Mr. Taylor in his lifetime; that on the Sunday week before the killing of Taylor he saw the defendant and Leonard Hensley at Taylor's house, and heard the conversation between them and Mr. Taylor about the larceny of the bridle and the threats that were made by Ance Rogers against old man Taylor, and in this respect the witness' testimony is not materially different from that of his brother, Mike Freeman, heretofore quoted.

Lon O'Dell, for the state, testified that he was 18 years old; lived about six or eight miles west of Marietta, and worked for J. E. Rose. This witness also testified as to being present at Taylor's house on the Sunday before the killing, and heard the dispute between Ance Rogers, Mart Rogers, Leonard Hensley, and old man Taylor. His testimony is not materially different from that of other witnesses for the state who were present at that time.

Anderson Rackley, for the state, testified to the same conversation.

Jesse Hamilton, for the state, testified that he lived out west on Rock creek; had been living there since last Christmas on Rogers' place, the father of the defendants; that he lived about 150 yards from the store of Dick Rogers; that he remembers the morning Henry Taylor was killed; that he left home about half hour by sun that morning, went over by Uncle Dick Rogers' house, and then rode down in the field to split stove wood; when he got over to Rogers' house Uncle Dick and the boys were there, and that just before he left Mr. Thaxton stop-

ped in; that he saw Mart and Ance, and that Hensley was putting a saddle on his horse just before he got to the house; he stopped there a very short time; that he was working about 200 yards south of Rogers' house that day; that when he left Rogers' house there was nobody there but Uncle Dick Rogers and Ance and Mart Rogers and Leonard Hensley and Mr. Thaxton; he thinks that Leonard Hensley left about the time he did, but did not pay any attention to that; that the place where he was working that day was about 150 yards east of Rock creek; that after he went out there to work he saw the defendants, Ance Rogers and Mart Rogers, come down towards the fence along Rock creek to work; that he first saw them up there along the road working on the fence; this was about an hour after the witness had left Rogers' house; that he never saw anybody else except these two defendants; did not pay much attention, as he was at work; he noticed these defendants driving posts; did not notice whether any of them had any weapon or not; the fence had been built along there, but was not finished; the last of the fence was not put up, and a cow could walk in and out of it; the wires were not stretched; that the witness remained down in the field until about 12 o'clock that day; that he heard a shot fired; never saw who fired it, but saw the smoke of the gun; this smoke was right up close to the road along where the witness had seen the boys at work.

"I think this was about 11 o'clock. I left the field about a half hour after that to go to my dinner. In a minute or two after the shooting I saw Mart Rogers and Ance Rogers going across the field toward Uncle Dick's house. When I first noticed them, they were about 20 or 30 yards from where I saw the smoke of the gun, and about 100 yards from Rogers' house. They were walking pretty peart. I saw something on the shoulder of one of them. I never paid any attention; couldn't tell what it was. I thought it was an axe or some other tool. I don't know how long it was after I saw the Rogers boys going down to the fence until I heard the shot; it might have been an hour and maybe two hours. In about five or ten minutes after the shooting Mr. Thaxton came down to where I was working. He stayed about five or ten minutes, and when

he started off I asked him what time it was, and he said five minutes until 12, or 25; I could not understand which. He never said anything to me about the killing; he started off like he was going home, and I never watched him. Mart Rogers came down there also before I quit work; it was just a little while. after Mr. Thaxton had been there. He did not tell me anything about anybody being killed. I afterwards went up to Uncle Dick's house, and there I saw Mart and Ance and Uncle Dick in the house. I asked what was the matter with Uncle Dick, and Ance Rogers said they had shot Mr. Taylor, or killed Mr. Taylor, I don't know which he said, and I asked him where he was, and he said 'Out there on the wagon,' sort of pointing up there on the side of the hill, and I said, 'Whereabouts?' or something that way, and he said he would show me. I stepped out. He said: 'Here he is; come out here and I will show him to you'—and he and Uncle Dick started out there. We went out to the road where we could see up the road to the wagon, and Ance says, 'There he is, on the wagon.' Uncle Dick says, 'I don't see him; where is he? and Ance says, 'There he is; don't you see his legs there hanging over the spring seat?' and then I saw him, and we went up there. Ance went back to the house. I found Mr. Taylor lying back on the wagon with his feet over the spring seat, and one of the lines was drawn around his legs. The wagon had double side boards on, and was full of corn. His head was lying back on the corn. He was lying flat on his back. He had on a white hat. His head was lying on that hat. We just went up within three or four feet of the wagon; didn't make any examination of the wounds. Ance Rogers made no statement to me, except he told me he shot him down on Rock creek. The wagon was 40 or 50 yards up the hill east of Rogers' store when I saw it. The next person I saw at the wagon was a fellow named Jones. He was working some prisoners down on the road there that day. On the afternoon of the killing I went down on Rock creek with Mr. Stanley, the county attorney, down to where I had seen these boys chopping wood, and I saw Mr. Stanley pick up a knife down there—an old knife. The knife was found just below the old road, pretty close to a stump. There was just one stump close by a burr oak, 12 to 16 inches through, or a little bigger; I never paid any attention. There was some trees close there—one large oak tree. This tree was about 10 or 15 steps from the road and close to the stump. I could

not tell how far this tree and this stump were from where I saw the smoke of the gun; it was in that direction. There are trees and stumps along the road on Rock creek; not much brush on the east side of the road."

Olin Rhodes, for the state, testified that he lived at Marietta, and that he was city marshal; remembers the date of the killing of Henry Taylor; that on that date he went down to old man Freeman's on Rock creek in an automobile with Dr. Autry; that in going there they passed Rogers' house and went down the Rock Creek road south of there; that the road runs for a mile or two down along the bed of the creek.

"After passing Rogers' house going west, we turned south down Rock creek and went down the creek a mile and a half or two miles. As we were going down the creek, I seen two boys there close to Rogers' farm. One of them had a post in his hand, and they were working on a fence. We met several wagons that day all along the road, both going and coming; but after we passed these boys working on the fence going down to Mr. Freeman's we met a man hauling water; had barrels in his wagon. After we had gotten out of the bed of the creek and went along there over the rough part of the road through the thicket, we came back to Rock creek on a rock crossing and met there a man, who went east of us. He was driving north. This was something like three-quarters of a mile south of where we had seen the boys working on the fence. I don't know what time it was when we passed there, but when we left Freeman's to start back it was five minutes of 10 o'clock. We went back by the same road and saw these defendants still working on the fence. I think they were farther north as we went back than they were when we went down, I judge about 50 yards. I afterwards learned that Mr. Taylor had been killed that day. After I learned that, Mr. Stanley, the county attorney, and I got a team and went out there. I afterward examined the wounds on the body of Mr. Taylor. I helped undress him. He was shot in the right side of the head about the temple and close to the eye, and the shot came out near the nose and both his eyes were gone. I counted six holes in his head; they looked about the size of No. 2 buckshot to me."

The witness described the hat that the deceased had on, showing the shot marks, and the same was admitted in evi-

dence. The witness testified that the shots came out higher than where they entered. When the deceased was undressed witness saw his pockets examined, and there was a small penknife and a 32 Winchester cartridge, a pencil, and some matches taken out. Witness then gave measurements of wounds from the distance to the point of entrance to exit, etc.

Tom Stofel, for the state, testified that he lived out west of Marietta, about a mile from Rogers' place; that on the day that Mr. Taylor was killed he went to haul water from the Rock creek spring, which was about a mile south of Rogers'; that going to the spring he had to pass Rogers' place and go down the Rock creek road; that on that day he saw Henry Taylor, the deceased; met him as he was coming back; that Taylor had a load of corn and was near the ranchhouse; Taylor was in a wagon, driving a span of mules; that after the witness met Mr. Taylor he saw the defendants down on Rock creek.

"It was between a quarter and a half mile from where I saw Taylor. Mart Rogers came down into the creek after I had traveled up the road in the bed of the creek about 25 yards. I came on up the creek, and Ance came up the bank and crawled under the fence, and there was a tree cut down, and he walked in behind that tree from me. He had a gun, a doubled-barrel shotgun, and when he crawled under the fence he came on down and walked in behind the tree just before I got up to him, or when I was about even with him. He checked up like he was looking for something, and one of my mules is afraid of a gun, and I watched him more closely than I would have if he had not sort of checked up. He had the gun right up on his arm. This was in the morning along about half after 9, I guess. I met Olin Rhodes and Dr. Autry before I did the Rogers boys. They were driving in an automobile in the same direction that Mr. Taylor was going. I met them about a quarter of a mile south of where the boys were working. I judge I passed the Rogers' store, going after this water, about 8 o'clock that morning. When I passed there, these defendants were working on the house. Ance Rogers never spoke to me when I passed him going back. There was about 20 or 25 feet between us when he was standing behind the tree top."

R. C. Baker, for the state, testified that he was a county commissioner and lived at Leon; that he remembered the day that Henry Taylor was killed, and heard the shooting; was coming through the Rock creek bottoms beyond the creek, about 250 or 300 yards on the other side of Rogers' store, west of the store, about 150 yards from the creek.

"After hearing the shot I came right on in the buggy right across the creek. Jim Mays was with me. After I crossed the creek, my attention was directed to two men coming across the field southwest of Rogers' joint. They were angling across the field towards Rogers' place. I did not recognize them. One of them was larger than the other. It looked to me like one of them was carrying a gun. Pretty soon after I saw these two men, I noticed a wagon coming. It had just turned around the corner of this field, the northwest corner of it. After turning the corner it started east toward Rogers' house. There were two mules hitched to the wagon, and they were traveling at a fast walk. I noticed some one lying in the wagon. I did not know what it was at first, but the wagon kept going on, and I noticed that the man was not paying any attention to the team. It ran over obstacles and jarred around a great deal, and I kept noticing the wagon. It went like it was going to the house, and I suppose it went within 20 or 30 feet of Rogers' house, and I thought it had stopped there; but as we kept driving very slow up the hill directly I saw the wagon come up the hill. It came up the hill on the steep place, up onto the main right of way, and when it got to where the road was broad enough for us to turn to one side, we turned out on the left hand side, and this team came up on the side of us next the bank, and we stopped the team, and then we saw what was on the wagon. I never got out of my buggy. I saw a man on the wagon that looked like he was mortally wounded. He was lying on his back, seemed like in the center of the wagon. His feet were hanging up over the spring seat. The seat had turned up edgeways. He was just breathing at the time. I told Jim Mays to go back down to Rogers' house and see what he could find out, and see what was to be done. He went down there, and came back in a very few minutes. I did not hear any conversation that he had with any one at Rogers' place. He got in the buggy, and we came on to Marietta to get the officers. I saw that the man needed help. We

left the wagon standing right where we had stopped it. The wagon was loaded with corn."

Jim Mays, for the state, testified that he lived at Leon, and was a constable; that he remembered the day that Henry Taylor was killed, and heard the shooting; that he was with R. C. Baker at the time. This witness' testimony is practically the same as that of R. C. Baker, with the addition of what occurred when he went down to Rogers' store after discovering the man in the wagon dying. Concerning his trip to Rogers' store he had the following to say:

"I got out of the buggy and then went down to Uncle Dick's joint to get some rope, and I seen Mr. Thaxton standing in there, and I holloed, 'Hello, Uncle Dick,' to him two or three times; I don't remember how many times I holloed. I said, 'There is a dead man out here.' Mr. Thaxton says, 'A dead man!' I says, 'Yes; a man has been shot,' and by that time Uncle Dick Rogers came up to the door facing and leaned up against the door facing, and pointed his left hand out this way, and he said: 'Walk on away from here; go on up the hill; get out and go on all of you'—two or three times. I saw two or three other people in Rogers' place at that time besides Uncle Dick and Mr. Thaxton. I could not tell who they were. I think one of them was Mart Rogers. Somebody had a bottle of whisky in his hand. I think it was Mr. Thaxton. After Uncle Dick spoke to me this way, I went up the hill and got into the buggy and came on to Marietta and reported it to the sheriff, and I got in the buggy with Bo Blake, deputy sheriff, and went back to the scene of the tragedy. When I got back out there, the wagon was just about where it was when I left it, and Uncle Dick Rogers and some man was standing sort of at the back end of the wagon. I stayed in the buggy while Mr. Blake went down to the joint. When he came back up to where I was at the wagon, I wanted to move the dead man around, and I raised up the slicker which was on the front end of the wagon, and when I looked under it I saw a gun. The slicker was doubled up in the front end of the wagon, and the spring seat had fallen over the end of the slicker. The pistol was lying down under the slicker. I did not examine it to see its condition. I gave the pistol to Bo Blake. It seemed to be a 44 or 45 frame revolver. The body was taken down to Fraer's undertaking establishment."

R. C. Baker, for the state, recalled, testified that the shooting occurred about 11 o'clock, perhaps a little bit before 11.

W. H. Hartman, for the state, testified that he lived at Leon, and on the day of the killing he came to Marietta, and in coming to Marietta he passed the Rogers boys on Rock creek about 11:30 in the morning; that he saw Mr. Rogers there; that he had a conversation with Mr. Rogers and learned that Mr. Taylor had been shot; that as he left the store and came up the hill he saw a wagon and the dead man on it.

"This was about 40 or 60 yards east of Rogers' store. The body was lying on a load of corn; looked like the dead man had been sitting on the spring seat, and that he just fell back. The spring seat turned back, and his knee got over the front of the seat. His right hand was lying down that way, and his left hand was back that way (indicating.) I did not stop at the wagon. When I left the wagon, Uncle Dick Rogers was there. I was there when Bo Blake and some other man came out there. I saw Mr. Mays pick up the slicker and the gun out of the wagon. The slicker was on the front of the wagon. I did not see the gun until the slicker was picked up. The slicker looked like it had been bundled up and thrown upon the wagon."

Will Anglin, for the state, testified that he lived at Marietta; that he knew the defendants, Ance and Mart Rogers, and also the deceased, Henry Taylor; that on the day of the killing he went out to the scene with Bo Blake and Jim Mays.

"The first thing I saw was a wagon loaded with corn and a dead man lying on his back on top of the wagon. This wagon was about halfway up the turn of the hill east of Rogers' house. When we got out there, Uncle Dick Rogers and Mr. Hamilton were six or eight steps back of the back end of the wagon. We went down to Rogers' house. Nobody was there but Ance and Mart Rogers. Ance was in a little side room putting on his boots. Mart was sitting back in the south end of the room. Uncle Dick Rogers went down there with us. Ance said that he killed Taylor, and was ready to go. He said he was working on the fence at the time of the killing. He did not tell me exactly where he was. He simply said down there by the old road. Mr. Blake asked for the gun that the killing was done with, but Uncle Dick Rogers did not want to give it up. We

examined it, and it was still loaded. Ance said that he had reloaded it. I did not examine the kind of shells it was loaded with. Ance set out a little bottle of whisky and asked me to take a drink, and I just made the remark that there was not enough in the bottle for all of us, and he just set it back and set out a full pint, and we all taken a few sups out of it. Bo Blake put the pint in his pocket and said, 'I will take that with me.' Ance got in the buggy with me, and we drove on up to the top of the hill and stopped there. While I was sitting there, I asked Ance to tell how the killing occurred, and he said that they had had some little trouble, some trouble over a bridle, and that Mr. Taylor had threatened his life, and he had come by that morning and told his young brother than he was fixed for him, and asked where he was. I don't remember where his brother told him that he was. I believe, though, he said he was out hunting a hawk, or something like that. Ance said that when Mr. Taylor came up with a load of corn he was down working on the fence and had a shotgun down there, and he had found some squirrels, or he was looking for some squirrels, was how he came to have the gun down there; and he said Mr. Taylor stopped and commenced cussing him and made a motion. He supposed he had a gun, and he said he just stepped back and got his gun from against the tree as quick as he could and shot him. The way Ance made the motion to me, he just throwed his head down by his side like he was going down after a gun or something. He said he did not see any gun though. Ance said that the shotgun was loaded with No. 2 buckshot. He said the gun was leaning against a tree near where he was at work. When Ance made the motion indicating how Mr. Taylor had done at the time he shot him, Mr. Blake was present."

Bo Blake, for the state, testified that he was deputy sheriff of Love county; that he remembered the day Henry Taylor was killed; that after the killing he went out to the scene with Jim Mays and Will Anglin; that he noticed the wagon and team, the dead man on it, and from there went on down to Uncle Dick Rogers' house; the first person he saw was Mart Rogers, and he asked him where Ance was, and he said he was in the other room.

"I walked into the room, and Ance was sitting on the edge of the bed, and I spoke to him and asked what he was doing

out there, and he said, 'Nothing much.' I said, 'Who killed that old man up there?' Ance said, 'I did.' I asked him what he killed him with, and he said a shotgun. I asked him where he killed him, and he got up by the door and pointed and said, 'I killed him right down there,' pointing down the creek. I asked him what the trouble arose over, and I think he said something like this: That Taylor had insulted him; accused him of doing something or saying something. That they had had trouble before. Taylor had accused him of doing things that he did not like to be accused of, or something to that effect. I don't remember the exact language used. I told him I would have to take him with me, and he said: 'All right; I'm ready.' I asked him where the gun was, and he said, 'Right there' (pointing), and I noticed three guns up in the corner. I reached and took hold of the shotgun, and Uncle Dick Rogers took hold of it about the same time, and he said he could not give up his gun. I told him I would have to take it, and Ance spoke up and said, 'He will give it back to you,' or something to that effect. 'Let him have it.' And he turned it over to me, and I opened it up and noticed that it had not been shot; it had all full shells in it; and I says, 'Ance, this gun has not been shot,' and he says: 'Yes; I reloaded it.' I cut open one of the shells that was in the gun, and it was loaded with No. 4 buckshot."

"We went out of the house and got into the buggy, and Jim Mays was sitting in the buggy holding the lines, and I told him to get out and drive that wagon with that old man in it up on the top of the hill, and Mr. Anglin and Ance and myself got into the buggy. When we got to the top of the hill, we stopped, and I got out and straightened the dead man out on the wagon and then drove on down to a fellow by the name of Thaxton, and put him in the wagon. There was a slicker and a sixshooter on the front end of the wagon. I examined the pistol. It was neither cocked, nor had it been shot. It was a 32-caliber on a 45 frame. I asked Ance how this killing occurred, and he said he was down on the creek fixing the fence, he and his brother Mart, and that he went off to hunt a calf, and when he came back Mart told him that that fellow Taylor had passed by there and asked where Ance was, and Mart told him that he had gone off hunting a calf, or something, and Taylor replied, 'Well, tell him I am looking for him,' and ap-

plied a vile epithet; and Ance said that Mart told him what Taylor had said when he came back. He said he was still working on the fence when Mr. Taylor drove back, and as he came up he said, 'Oh, yes,' applying a vile epithet, 'I have found you now,' and that he reached down for his gun, or reached like he was going for a gun, and he said, 'I run and got my gun and shot as quick as I could.' I asked him how far his gun was away, and he pointed out to a post on the side of the road, a telephone post, about as far as from here to the corner of that seat over there—about as far as from here to that boy, the boy that stands up. I would judge it would be 15 or 16 feet, maybe a little farther. Ance said that after Taylor made the demonstration like he was going to get his gun that he ran and got his gun and shot as quick as he could. I asked him if he had seen a gun, and he said, 'No;' he had not seen any. I asked him what he was doing with a shotgun down there, and I believe he said he was hunting squirrels, and I asked him, What were you doing hunting squirrels with that size shot? and he says, 'it was all I had.' He said that old man Taylor and he had had some trouble a few days before that, and that the old man either accused him of stealing a bridle or some money from him, and that old man Taylor was all the time pinching him, or something to that effect."

The witness then described the wounds that were on the dead man's body.

James Fraer, for the state, testified that he lived at Marietta, and was in the furniture and undertaking business; that on the 10th of April, 1911, the body of Henry Taylor was brought to his place of business, and that he prepared it for burial and made an examination of the wounds; that the wounds entered the body on the right side of the head, part of them about even or a little above the right eye, and part of them below the eye, about one inch to the back of the eye.

"There were about five holes, all close together, in a space that could have been covered by a dollar. They came out by the left eye. Both eyes were blown out of the head, and there was a hole through the nose. The range of the bullets was slightly from behind and upward. I did not see any powder burns on the face. The point of exit was just a slight bit higher that the point of entrance."

Jim Wolfenbarger, on behalf of the accused, testified that he lived at Bowles; that he knew the defendant Ance Rogers, and also Henry Taylor in his lifetime; that a short time before the killing, about two weeks, he sold Henry Taylor a gun, a 32 on a 45 frame.

"I can't tell what make it was. I never paid much attention to it. All I know is that it was a 32 on a 45 frame. I would know the gun if I saw it. (Witness is handed a gun.) I don't believe I can get the cylinder off. I think I could tell you if I could get it off. (After taking out the cylinder): Yes; I believe it is the gun. When I sold him the gun, I had a conversation with Taylor about Ance Rogers and old man Rogers. He said the boys had been talking about him a great deal, and he was going to try to defend himself. He said, 'If they ever run onto me, I am going to kill him.' He said Ance Rogers first, and then he said the whole outfit, He said he was going to kill the whole outfit if they run onto him again. On Sunday morning before Taylor was killed I told Ance he had better look out. This was all I said to him. I told Pat Rogers and Leonard Hensley what the old man had said about Ance."

On cross-examination the witness was asked what peculiar mark there was in the cylinder of a gun by which he could identify it, and he said:

"There is a kind of a groove where the pin goes in. I just told Ance that he had better look out. I never told him why. I said, 'Look out,' or something of that kind. Ance told me that he was going to whip old man Taylor if he did not keep his mouth shut. He claimed that old man Taylor said he had stolen some money from him."

Tom Hawthorne, for the accused, testified that he had lived around Marietta for four or five years; that he was acquainted with Henry Taylor in his lifetime, and also knew Ance Rogers; that about a month before old man Taylor was killed that he had a conversation with him out in Riley's field when he was plowing; he had lost some money out there in the field and had been harrowing over the ground; thought he had plowed the money under and was looking for it, and said he might as well have taken it down and given it to Ance Rogers;

that Rogers stole $17.50 from him, and that he might as well have given him this for all the good it had done him; and he went on to say that he would get Rogers for it, and, furthermore, the whole works, if they fooled with him.

"I told Ance about this the latter part of March. I believe it must have been on Thursday or Friday before the killing on Monday. I don't remember just exactly the day. There was nobody present when I told him."

On cross-examination it developed that this witness was a very intimate friend of the Rogers family.

Henry Johnson, for the accused, testified that he lived at Marietta; that he had lived in Love county 18 or 19 years, and that he knew Henry Taylor in his lifetime; that he had a conversation with Henry Taylor, not in reference to Ance Rogers alone, but to the whole Rogers family; that was 6 or 7 months ago.

"He mentioned Ance Rogers' name and said that Ance had robbed him of some money. He said if he could get hold of some of that house they built down there he would put a stick of dynamite under it and blow them away. I was advising him not to talk that way; that he might get into trouble. I told him I thought I would keep my mouth shut. This was all I said. I never told any of the Rogers about it."

Thorney B. Huddlestone, for the accused, testified that he lived four miles north of Marietta; that he had met Ance Rogers, and knew Henry Taylor in his lifetime; that some time in the fall before the killing he had a conversation with Taylor in reference to Ance Rogers.

"He said that Ance had robbed him while he [Taylor] was drunk, and he said he was going to have his money if he had to get his knife and work on him. He did not use Ance's name. I did not pay much attention to it. If he said it was Ance, I don't remember."

Frank Seagroves, for the accused, testified that he was a merchant and lived at Bowles; knew the defendant Ance Rogers; that he had a conversation with Taylor about the Rogers family, not about Ance. The record does not disclose what this conversation was.

Fred Errick, for the accused, testified that he lived on Rock creek, and was acquainted with Henry Taylor in his lifetime and knew Ance Rogers; that Taylor had a conversation with him about Ance Rogers on Saturday before the killing occurred on Monday; this occurred at Taylor's house; nobody was present except the two.

"He said Ance threatened to whip him, and he says, 'When he jumps on me, he will jump off quicker than he jumps on.' He said that Ance had accused him of stealing a bridle, or that Mr. Taylor had accused Ance of stealing a bridle; that is what the boys had accused him of. I asked him what they were going to whip him for, and he said that the boys had accused him—had told that he had told that they had stolen a bridle."

Witness lived about 300 yards from Rogers' store.

Leonard Hensley, for the accused, testified that he lived at Cornish, but had been down in Love county for the past two years; that he is a cousin of Ance Rogers; knew Henry Taylor in his lifetime; also knew Jim Wolfenbarger and had a conversation with Mr. Wolfenbarger prior to the time Taylor was killed; that he told Ance about it; told him that Jim Wolfenbarger said that old man Taylor was aiming to kill him; this was on Sunday before the killing on Monday; that on the Sunday week before the killing the witness and Ance and Mart Rogers went over to Taylor's house.

"There was quite a bunch of boys over there—Mike Freeman, Lon O'Dell, and Anderson Rackley. Mr. Taylor had accused us of stealing a bridle up there as we came by the day before, and I went up there and holloed, 'Hello,' and old man Taylor came out, and I says, 'Where is Mike?' and he says, 'In the house,' and I told him that we had come there to straighten up about that bridle, and he says: 'I can quick tell you what became of that bridle. You are the only ones that could have got it; the only ones that passed here.' And Ance said, 'We would be bright ones to come up here and steal a bridle, and you out there at work,' and Mr. Taylor says: 'You are the only ones that could have got it; the only ones that passed here. You would do anything; you robbed me of $17 down here last fall.' And Ance says, 'Now, I did not come up

here for no trouble,' and Taylor went to cussing him and opened a knife and was leaning up against the wire fence, and the next thing he turned around and walked out and opened the knife and commenced shaking it at Ance, and Ance said, 'Mr. Taylor, I didn't come up here for no trouble, and I don't want any,' and he said, 'if nothing else will do you, if you will come off away from your house, I will whip hell out of you,' and Mr. Taylor says, 'No, I am not able to fight you fair,' but he says: 'You have got me to meet again over this, and I will be fixed for you, and I will make you regret you ever seen me. Henry Freeman said he understood one of you wanted to whip Mike'—and if we wanted to do it that right there was a good place to do it, and said if Mike couldn't whip us he could. On the day of the killing I went to Marsden to pay a fine, and didn't get back until about half past 2 or 3 o'clock that evening. When I left that morning, Ance was ditching around their house there."

On cross-examination witness said that he lived at Cornish and had a crop on Bill Newton's place, and had left it about two weeks before the killing and had been down to the Rogers' place all that time; Mr. Rogers' house is a three-room house, facing north; that he kept some groceries in the front room; Mr. Rogers is 56; three of them were staying there at that time; that at the time of the killing "we had been working on this fence and had it all completed, except two or three more days' work on it."

S. H. Thaxton, for the accused, testified that he knew Henry Taylor in his lifetime, also knew Ance Rogers, Leonard Hensley, Pat Rogers, and Mart Rogers; that on the day Henry Taylor was killed he saw Ance Rogers at Uncle Dick Rogers' house between 9 and 10 o'clock in the morning.

"When I went down there that morning, I saw Pat Rogers, Leonard Hensley, Ance Rogers, Mart Rogers, and Uncle Dick Rogers. Ance Rogers was working on their house, throwing up dirt around it, Leonard Hensley was saddling his pony, and Pat Rogers either had a horse saddled, or was saddling it. I don't know which. About 15 or 20 minutes after I got there, Leonard Hensley and Pat Rogers left. Ance and Mart Rogers were there at the house until Uncle Dick sent them off to fix some fence. They left the house and went off down the hill

toward the northwest corner of the field. Ance had a gun and Mart had an axe. I don't know how long I stayed at Rogers' house, but it did not seem like I was there over half an hour. I saw Mr. Hamilton working down in the field that day in some new ground. I saw Mr. Hamilton at the house before he went down there to work. I went down to where he was working about 11 o'clock that day. Hamilton asked me what time of day it was, and I told him; but I can't remember what time it was. I never saw Ance and Mart Rogers that morning after I saw them go down to work. I live about 400 or 500 yards from Rogers' store. On the day before the killing I was down to Rogers' place and drank some whisky with Uncle Dick Rogers. I suppose the sun had been up three or four hours. When I went down there on the day of the killing, I saw Mr. Taylor, the dead man, pass there that morning; it was 9 or 10 o'clock. I don't mean to say that I saw him going down after the corn. I heard the shot fired. I judge this was something like half an hour after I had seen Mart and Ance Rogers go down to fix the fence. The next thing I saw after I heard the shot fired was Mr. Taylor in the wagon coming up the hill. The wagon was within 30 or 40 yards of the house or closer, maybe as close as 20 steps. I supposed Taylor was dead; he looked like he was dead to me; we did not stop the wagon. Just about that time Uncle Dick had pulled out some whisky, and he gave me a drink. I think, as the wagon passed, I told Uncle Dick that I believed that man was dead; I don't think he said anything. Just directly after the wagon went back, Mart and Ance Rogers came into the side room of that building and then went into the rear room. If they said anything, I did not hear them. Ance had a double-barrel shotgun, and as well as I remember he set it down in the corner. I did not stay there at the house but two or three minutes longer. I didn't go up to where the dead man was. I went over to the field where Mr. Hamilton was; he was working about 150 yards from where the shooting occurred. I told him that there was a man up there killed. I did not tell him who killed him. From there I went home."

Mart Rogers, for the accused, testified that he lived at Healdton with his mother; that his mother and father had been separated about six years; that he came down to his father's place about two weeks before the killing to help him

build a fence, and that in that time he fenced about 160 acres; that he remembered going up to Taylor's house about a week or ten days before the killing with Ance Rogers and Leonard Hensley; went up to straighten about a bridle that Mr. Taylor had accused him of stealing.

"Some other people were there; I didn't know who they were. We went up to see Mike Freeman. When we got up there, Leonard holloed, 'Hello,' and Mr. Taylor came out, and Leonard says, 'Where is Mike Freeman?' Mr. Taylor says, 'He is in the house,' and Leonard says, 'I came up to straighten up about that there bridle question.' Mr. Taylor says, 'I can ———— quick tell you what I know about the bridle,' and Ance says, 'We would be a wise lot to come up here and steal a bridle, and you out at work in the lot there,' and Taylor just walked on the outside and commenced cussing us. He commenced cussing Ance for everything he could think of; I can't repeat the language used. Ance told him he did not come up there to have trouble, but if nothing else would do him but fight to come down here and he would whip him. Taylor told him, 'No,' that he was not able to fight him fair. He said that he would have to meet him again, and he would be fixed for him and make him regret that he ever saw him. Ance says, 'Boys, lets go,' and we turned around and went away. The next time we saw Mr. Taylor after this was on the day of the killing. Ance and I were working down in the field fixing the fence, and Ance had gone over in the field to count some posts. Taylor came by traveling in a wagon, a team of mules hitched to it. He drove up and stopped and asked me where Ance was, and I told him he was over in the field somewhere, and he said, 'I would like to see the ———— ———— ———— ———— ———— ———— ————,' and drove on down the creek. When Ance came back, I told him about it. We went back to work straightening up the fence. We had worked about 200 yards south of the northwest corner. After Taylor passed there, I saw other people pass, one man driving in a wagon; had some water in the wagon, hauling water. I did not know his name. The next time I saw Taylor that day he was traveling along in a wagon going north. I was cutting brush down in the bed of the creek, cutting tree tops, and Ance was dragging the brush up and putting it under the fence where the old road came out. Taylor drove up and says to Ance, 'Oh, yes.'

with an oath, 'I'll get even with you right here,' and Ance turned around and said, 'Even, how?' and Taylor said, 'I'll shoot your lights out; that is how;' and he sort of made a motion with his hand this way (indicating a forward and downward motion); and his team started up, and he sort of jerked up on the lines and made another motion down, and then Ance jumped and grabbed his gun and shot him. (The witness here indicated just how Ance jumped and got the gun and just how Taylor motioned.) When the shot was fired, the spring seat turned back, and Taylor fell over. Ance fired only one shot. After the shooting we went to the house across the field. The wagon went on up the road. I saw it as it went out of sight up the hill behind our house. It was going northeast. Ance was two or three steps from his gun when Taylor came up and stopped his team. When we went out to work that morning, I took an axe and a hammer, and Ance took a shotgun. I didn't see Taylor go by the house for the corn that morning. I was down working on the fence at that time. Before we went down to work on the fence that morning, I had been throwing some corn out of a wagon up by the house, and Ance had been shoveling some dirt by the house. I didn't get the corn thrown out of the wagon when I went down to work on the fence, and Ance hadn't got his work done either. I didn't know what the shotgun was loaded with. I didn't know that they kept buckshot there in the store. I don't know how long we had been down working on the fence when old man Taylor came after the corn, I guess it was about 15 minutes. After old man Taylor went by there, and while Ance was counting the posts, I went up to the house. I didn't stay but a minute or two. When I told Ance what old man Taylor said, he says. 'Let's hurry up and maybe we can get through here before he comes back.' He meant to get through building the fence along the road there. We had about 50 yards more of fence to build along the road there. When Mr. Stofel passed there with the water, I was working down in the bed of the creek, and Ance was about 10 steps from me at the time. I continued down in the creek. Ance turned out of the road and went up on the bank next to the fence. He had a shotgun at the time. Stofel was driving a team of mules to a wagon, and was going north at that time. He came from the direction that Taylor had come in. The killing occurred right close to where the old road went down, a little north of there, about three or four

steps, I guess. At that time Ance's gun was standing against a tree, an elm tree, the first large tree north on the old road. I guess Ance was about 50 yards from me at that time. I told Ance, 'There comes that fellow,' and Ance just kept on working. He was dragging brush at the time, and continued to work until Taylor stopped. Taylor was right up even with him before he stopped his wagon. At that time Ance was standing about 10 steps from the road from Taylor, and when Taylor drove up and stopped Ance kept on working. His back was turned toward Taylor. At that time I was cutting some brush off the tree tops in the bed of the creek. I guess I was about 10 steps southwest of where Taylor stopped. When Taylor stopped, he ran his hand down this way like he was going to get something (indicating a forward and downward movement), with his right hand. I don't know whether I was west of him or not. I think I was a little bit more on the east than on the west. I was back down the creek from him. He says, 'I'll get you now,' running his hand down in front of him. Ance says, 'Get even, how?' and Taylor says, 'I'll shoot your lights out: that is how.' Ance quit working when he said he would shoot his lights out. He did not stop until then. Ance just turned around. When Mr. Taylor was going for his gun, Ance jumped and grabbed his gun and shot him. Ance went to this tree and got his gun. When he turned to get his gun, that threw his side toward Taylor, not his back. Mr. Taylor never got his gun. He did not have it at the time Ance shot him. Ance did not go after his gun until Taylor made the second effort to get his. Where Taylor stopped was just about even with where Ance's gun was standing by the tree. Q. I will ask you if you told Sheriff Davis and Mr. Rhodes, as you were coming in from your father's place the afternoon of the killing, if Mr. Taylor did not go to his hip pocket for that gun? A. No, sir; I did not. Q. You deny that, do you? A. Yes, sir; I do. After the shooting we went back up to my father's store. We never went up to where the dead man was; didn't go up to see if we could do anything for him or not. Afterwards I went down into the field where Mr. Hamilton was working. I didn't tell him anything about the killing."

Ance Rogers, the accused, testified that he lived at Healdton with his mother; his father and mother were separated, and had been living apart five or six years; that the last two or

three weeks before the killing he had been working and staying with his father, helping build a fence; that on the Sunday week before the killing he went up to Taylor's house to see about a bridle that he had been accused of stealing.

"We called him out from the house, and Leonard says, 'We come to straighten up about that bridle,' and Taylor says, 'I can ——— quick tell you what I know about that bridle question,' and he says, 'You know ——— well you got it.' I said, 'We would look wise up here to steal a bridle, and you out there by the lot at work, wouldn't I?' and he opened his knife and come outside to where I was, right up close to me, and commenced cussing me and said: 'You would do anything; you stole $17.50 from me down there last summer.' I called him a liar. He kept on cussing, and I said, 'if nothing else will do you but fight, come off down from your place and I will whip hell out of you, or try to do it,' and he said: 'No; I'm not able to fight you fair, but the next time I see you I will be prepared for you, and I will make you regret you ever seen me.' The next time I saw Mr. Taylor was on the Monday week after that; I saw him come up Rock creek. Mart had told me that a fellow had passed there who seemed to be awful mad. He said he wanted to see me, and I asked him what he wanted, and he said, 'I would like to see the ——— ——— ——— ——— ——— ———.' I told him I thought it was old man Taylor. I had not seen Taylor that morning before that. I had seen Mr. Rhodes pass by that morning in an automobile. I saw some other parties pass by that morning, but didn't know who they were. I also saw a man that I know to be Stofel pass there hauling some water. When he passed, I was working about 30 or 40 yards from the northwest corner of the field. We went down there to tighten some wire. There was no tree top down at that place, as testified to by Stofel. I spoke to him when he passed."

Witness also tells of certain threats by Taylor that were communicated to him by Jim Wolfenbarger, Leonard Hensley, and Tom Hawthorne:

"When Taylor came back that day, Mart says, 'Yonder comes that fellow now,' I looked around and says, 'That is Taylor.' He was about 30 or 40 yards from me at that time; he was down in the bed of the creek and was coming up the

creek; ·he came up even with me, and he says: 'Oh, yes; you ——— ——— ——— ——— ——— ———, I'll get even with you right here.' I was stuffing some brush under the fence. I says, 'Even, how?' and he· said: 'I'll shoot your lights out;· that is how.' He reached down after his gun, and his team started up, and he stopped them and reached down again, and then I jumped and grabbed my gun as quick as I could and shot him. My gun was sitting by the side of an elm tree. Mr. Taylor was west of me, sitting in his wagon. The bank of the creek on which I was standing was about four feet high. My gun was about two or three steps from me when I started after it. Taylor was in a crouching position when I shot him. I shot one time. I shot to save my life. After the shooting the team jumped as fast as they could, and the seat fell back with Mr. Taylor, and he fell back on the corn. He never said anything. I never told anybody what I had done. When I was coming to town with Mr. Blake that day, I indicated the distance that I was from Mr. Taylor at the time I did the shooting, not the distance that I was from my gun."

On cross-examination the witness testified that he was 25 or 30 years old, didn't know which; that when old man Taylor had ·cursed him and accused him of stealing a bridle on the Sunday week before the killing that it made him mad, and that he left Taylor's house mad at him.; that when he took the shotgun with him that day he did not know what kind of shot it was loaded with.

"I picked up the gun and unbreeched it and saw ˙that it was loaded. I didn't tell Will Anglin that that was the only kind of shot we had there. I don't know whether I put the same kind of shell in the gun when I reloaded it after the killing that was in there when I shot it, or not. I don't know whether we had any shot out there that was not buckshot or not. I took the gun down there thinking that I would probably see some squirrels. I had not killed any that morning. I didn't examine to see what kind of shot I was taking along. Sometimes I shoot squirrels with buckshot."

Al Davis, in rebuttal for the state, testified that he is the sheriff of Love county; that he is acquainted with Mart Rogers.

"Q. I will ask you, Mr.· Davis, if on the afternoon of the killing of Henry Taylor, ˙if the witness Mart Rogers did not

tell you in the presence of Mr. Rhodes that the dead man, Taylor, went back to his hip pocket for the gun, and that Ance Rogers, his brother, jumped and got his gun and shot him? A. Yes, sir."

Olin Rhodes, in rebuttal for the state, testified the same as sheriff Al Davis.

J. W. Blassingame testified that he was the surveyor of Love county, and that the bank on the east side of the creek, down along where this shooting occurred, is six feet high, and that the elm tree standing in the field north of the old road is 13 feet from the road.

The first assignment of error raised by counsel on behalf of the plaintiff in error is as follows: The court erred in not sustaining the objection of plaintiff in error to the testimony of Olin Rhodes, wherein he was asked, on direct examination, these questions:

"Q. What did Mart Rogers, the defendant, say to Sheriff Davis? Mr. Eddleman: Now, if the court please, on behalf of the defendant Ance Rogers, we object to this testimony as incompetent, irrelevant, and immaterial. The Court: I have already instructed the jury on my own accord that the testimony applied only to Mart Rogers. Mr. Eddleman: We want to save an exception to any declaration of Mart Rogers at this time on behalf of Ance Rogers. The Court: I have anticipated that myself for you and instructed the jury that it apply only to Mart Rogers—whatever the talk was. He may answer the question. Proceed. (To the ruling and action of the court the defendants at the time excepted.) A. Mr. Davis, after talking to him about it—he said he didn't want to talk about it first, but he said he would like to know some particulars about it, and Mart told him that he killed him, and he had it to do. Q. That who had killed him? A. He said, 'He killed him, and he had it to do.' Q. He said who killed him? A. That Ance killed him. Q. How did he say it happened? A. In my judgment he said there—The Court: Wait a minute; I will hold up that testimony; I will hold that up. You would better hold that back at this time—declarations—I thought you were seeking only declarations against Mart Rogers. Mr. Mathers: Yes. Mr. Eddleman: That is what we objected to. The Court: I

do not think the evidence is competent now, at this time. Mr. Mathers: I would like to tell the court what we expect to prove by him. (The county attorney talks to the court out of the hearing of the jury and the reporter.) The Court: At this time, gentlemen of the jury, you will not consider any statement that the witness has made as coming from Mart Rogers to these officers after the killing took place. Any declarations that he may have made against his brother are not competent now, and therefore you will not consider what has been said. Proceed."

Counsel concede that this assignment is without merit. The trial court excluded the testimony from the consideration of the jury. But even if it had been admitted no harm could have resulted, because the accused afterwards admitted the killing himself, and as to this fact there was and could have been no issue, and therefore could have been no injury.

Counsels' next assignment is as follows:

"The court erred in permitting the witness Jim Mays to give the following testimony on behalf of the state: 'I got out then and went back down to Uncle Dick's joint to get some rope, and I seen Mr. Thaxton standing there, and I holloed, "Hello, Uncle Dick," to him two or three times; I don't recollect how many times I holloed. I said, "There is a dead man out here." Mr. Thaxton says, "A dead man!" I says, "Yes; a man has been shot;" and by that time Uncle Dick Rogers came up to the door facing and leaned up against the door facing about that distance from me, and he said— Mr. Eddleman: Wait a minute. We object to any statements there, unless it was in the presence of these defendants. Q. Were those two defendants in the room there? A. I could not say whether they were or not. I seen somebody there, but I— Q. Who else did you see there besides old man Rogers and Mr. Thaxton? A. Well, sir, I could not say to be certain who they were; I taken it to be that young man sitting over there. Q. Which one did you take it to be? A. That one— the black-headed boy. Q. Mart Rogers? A. Mart; I taken it to be him, but I could not swear it was Mart. Q. Was any one else in there? A. Yes; I seen some more in there, but I could not say who they were. The Court: How long was that after—Mr. Mathers, when does the state claim that Mr. Baker and Mr. Mays saw this man? Mr.

Mathers: I was just going to ask him. The Court: I ask that question in view of the ruling on that testimony just now.'"

This testimony was not improperly admitted. The Court, however, excluded it evidently because it was in doubt as to its admissibility; but even had it been inadmissible it does not appear that serious injury would have resulted. The circumstances indicate strongly that the accused was present, and, even though he was not, this occurrence was immediately following the homicide. The Assistant Attorney General insists that this testimony was properly admitted as a part of the *res gestae* and confined within the limits of time and matter that tended reasonably to shed light on the killing. Witnesses Mays and Baker both testified that they were driving along the road together when they heard a shot fired, and a short time thereafter, coming from the direction in which they heard the shot, they saw a wagon with two mules hitched to it coming at a fast walk and a man on top of the wagon, apparently wounded. Then they saw two men, one larger than the other, coming through the bottom from the direction in which they heard the shot; one of them carrying a gun and going in the direction of Dick Rogers' house. Undoubtedly these two persons were the accused and his brother who was charged jointly with him. The team came on up the road behind them and passed the Rogers' house. No effort was there made to stop it. Mays and Baker waited until the team overtook them, and they stopped it and found the man on the wagon mortally wounded. All this occurred within a very short period. Mays went immediately back to the Rogers' house and made inquiries as to the killing. He had seen the man with the gun, and his companion, going in that direction. No other person except the wounded man had been seen. We are unable to discover anything in the action of the trial court that justifies criticism of this ruling.

Counsel next complain of the action of the court in permitting the introduction of certain testimony which tended to incriminate Mart Rogers, who was afterwards, by permission

of the court, discharged from prosecution by the county attorney. At the time he was discharged the court withdrew all the testimony from the jury which tended to incriminate Mart Rogers, and not this accused, and had previously limited, by proper instructions, the effect of such testimony to Mart Rogers. The action of the court was entirely fair and proper. The rulings and orders made in this connection are the law in this jurisdiction. The accused had the right to a separate trial if he had so demanded, and it is the well-recognized rule that testimony competent as to one codefendant on trial with another, although prejudicial to the other, is admissible, when properly limited by the trial court, by instructions, to the codefendant against whom it is admissible; and this is true even though the testimony is such that, were the complaining accused on separate trial, it would have been reversible error to admit such testimony. *Gonzalus v. State,* 7 Okla. Cr. 444, 123 Pac. 705.

Counsel next urge that this judgment should be reversed because the trial court permitted the state, on cross-examination, to ask certain questions indicating that witness Thaxton, who testified for the accused, was drinking whisky a few days before this homicide. We are of opinion that the learned trial judge extended the doctrine farther than this court ever intended in any of its opinions in this connection. The error, however, was trivial, and could not have resulted in serious injury. The doctrine in *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447, we think, is probably the safer rule.

The only other error urged, which we deem it necessary to in any way discuss, is based upon the following paragraph of the tenth instruction given by the court to the jury:

"You are instructed that if you believe from the evidence that threats to take the life of the defendant or do him great personal injury were made by the deceased, but were not communicated to the defendant prior to the homicide, such uncommunicated threats can be considered by you, in connection with all the other evidence in the case, in determining who was the

probable aggressor at the time of the killing, and for no other
purpose."

It is the contention of counsel that this instruction is ser-
iously prejudicial, because it prohibited the jury from consider-
ing these uncommunicated statements or threats for the pur-
pose of ascertaining the condition of the mind of the deceased,
his animus toward the accused, or for the purpose of explain-
ing his conduct at the time of the fatal shooting. We are of
opinion that the instruction could have included a clause per-
mitting the jury to consider these threats as tending to show
the feelings and interest of the deceased toward the accused at
the time of the shooting, and for the purpose of shedding light,
if any to be deduced therefrom, as to whether or not he so acted
at the time of the shooting as to induce in the mind of the
accused an honest belief that the deceased intended to kill him
or do him great bodily harm. But, considering this charge to-
gether with all of the instructions given by the court, and con-
struing them in the light of the evidence introduced, we are un-
able to conclude that the instruction was in any manner preju-
dicial.

We have gone carefully over the entire record in this case
and considered the same in all its phases, and are impelled to
the conclusion that this accused had a fair and impartial trial,
and that a just and proper conviction resulted therefrom. We
can find no error in the record which would justify this court
in interfering with the judgment, even had the death penalty
been imposed, and certainly none that would warrant an inter-
ference with the verdict of the jury, imposing life imprison-
ment and the judgment as pronounced.

Let the judgment in all things be affirmed.

DOYLE and FURMAN, JJ., concur.