CHARLIE SANDS et al. v. STATE.

No. A-9082.    April 9, 1937.
(67 Pac. [2d] 62.)

John F. Thomas, S. R. Harper, and John W. Tyree, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for the State.

DAVENPORT, P. J. The plaintiffs in error, for convenience hereinafter referred to as the defendants, were

jointly tried with Ruby Herring; were convicted and each of the defendants, Charlie Sands and Leon Siler, found guilty and their punishment assessed at death by electrocution. Motion for new trial was filed, considered, and overruled, and the defendants Sands and Siler appeal.

The record in this case is very voluminous; many pages of the testimony taken over repeated objections and incorporated in the record are wholly immaterial to an opinion in this case, and should not have been gone into by the trial court. The prosecution seems to have believed that it was necessary to prove the crimes committed or attempted to have been committed by the defendants Sands and Siler prior to the crime committed for which they were on trial.

In substance, the testimony material in this case is that Sands and Siler had both been inmates of the state penitentiary; Siler was released from the penitentiary on March 15, 1935; and Sands was released on May 25, 1935; they got together at or near the city of Seminole and started west toward Elgin, using stolen cars to make the trip. According to the statement of one of the defendants, they left Seminole with the intention of robbing a bank; they went to Fletcher, and from Fletcher to Healdton, accompanied by the wife of Siler; at Healdton Ruby Herring joined the party and they returned to a relative of one of the defendants near Fletcher. They left Fletcher the morning of May 31, 1935, driving toward the town of Elgin; somewhere along the road in helping a party out of the mud the car they were driving stuck in the mud, and while they were pushing the car out a couple drove up in a Ford V 8; the defendants took this car from the parties and drove into Elgin and robbed the Bank of Elgin. The defendants robbed the Bank of Elgin on May 31, 1935; as they fled from the bank they were pursued

by officers and a posse of citizens; a few miles from Elgin the defendants ran the Ford V 8 into a pasture near some brush and abandoned the car, taking the money and guns with them; one of the men in pursuit discovered the car, and in company with another of the pursuing posse examined it, and could not see whether any one was in the car; they fired a shot into the woods and in return were fired on by the robbers. The robbers took refuge in a small farm house, which was the home of the Medrano family. After the bandits had taken possession of the Medrano home, they advised the family and other parties visiting in the home if they would keep quiet they would not get hurt.

One of the officers asked Mrs. Medrano if she had seen anything of the bandits and she told them they caught a car and had gone on. After some delay, the officers went to the house and asked for water, and Mrs. Medrano put the bucket out of the screen door and they went to the well and got water.

In the meantime one of the bank robbers, one of the defendants in this case, had gotten possession of Mr. Medrano's shotgun and was sitting on a box by the door leading from the bedroom to the kitchen with the gun in his hand. The other defendant had a sawed off shotgun and a pistol. The testimony further shows that after the officers got the water, one of the deputies, J. E. Wilson, the deceased, remarked that, "I believe I will go look through the house," and went in the door leading to the kitchen. Another officer by the name of Deeds followed him. Immediately after Wilson stepped into the room a gun fired and Wilson fell. The shooting then began from the inside and outside. Many shots were fired, and both Sands and Siler were wounded.

In the meantime, while the shooting was going on, Mrs. Medrano got her child and made her way to the barn. One or more shots were fired into the barn. The Ambrose family, who was visiting, and Mr. Medrano were compelled to lie on the floor. About the time the officers entered the house where the bank robbers surrendered, after being wounded by the officers, Mr. Medrano was in the house and was seriously wounded, and Medrano was rushed to the hospital, where he died later on.

There is some conflict in the testimony as to whether Medrano was wounded by one of the bank robbers or by the shots from the outside during the firing on the home of Medrano. Both the defendants, Sands and Siler, testify. They admit the robbing of the bank; admit being pursued by the officers and the posse of citizens; admit abandoning the car they had driven to Elgin when they robbed the bank, in the pasture near the timber; they admit taking possession of the Medrano home where his family was, and where the members of the Ambrose family were visiting, and told them to keep quiet, and that if they would do so, they would not be harmed.

The testimony discloses that in discussing what would happen if the officers came, one of the defendants stated he would kill or shoot the first officer that came into the house. The defendants, in their testimony, admitted the shooting, that there was quite a gun battle in and around the Medrano home. The only justification they offer is they fired at the officers to keep the officers from killing them. They admit they were fugitives, trying to get away from the scene of the robbery in Elgin. They offer no justification for their acts in killing the deceased Wilson other than they did so to keep the officer from killing them.

The foregoing is all of the testimony that the court deems necessary to incorporate in this opinion.

The defendants, in their petition in error, allege 21 errors committed by the trial court which they deem sufficient to warrant a reversal of this case. All of the errors assigned are discussed together by the defendants. It is urged by the defendants that they shot the deceased Wilson in self-defense to avoid being killed by the officers and the posse; that·they were not allowed to surrender for the reason, as the defendants contend, the officers and posse were pursuing them for the purpose of killing them. It is not disputed that the defendants, accompanied by the wife of Siler and Ruby Herring, robbed the Bank of Elgin, and after the robbery fled from the scene of the robbery pursued by a hastily organized posse; they secreted themselves in a wooded creek bottom a few miles from the scene of the robbery.

The defendants further urge that from the demonstration on the part of the officers they believed it was their intention to pursue them and kill them without allowing them to surrender; that they had taken refuge in the farm home of Medrano; that the officers and posse were guilty of wanton, reckless, and criminal conduct at the house of Medrano before the arrest of the defendants; that the officers knew there were people in the house, but notwithstanding the knowledge of the officers and posse that the members of the Medrano and Ambrose families were in the house they recklessly fired into the house, putting in danger the lives of the two families, and defendants insist that when Mrs. Medrano came out of the house with her child she was fired upon as she went to the barn. They urge in their argument that after they were wounded the officers came to the house or shot into the house, wounding Mr. Medrano, the head of the house in which

they were located, and insist they did not have a fair and impartial trial.

An examination of this record clearly shows that many questions were gone into by the state wholly immaterial and unnecessary for the purpose of proving the crime of murder against the defendants, and the question gone into as to the defendants committing other crimes, while immaterial to the issues being tried, is a question for this court to determine under all the facts and circumstances, as to whether or not the defendants were deprived of a fair and impartial trial.

In Rhea v. Territory, 3 Okla. Cr. 230, 105 Pac. 314, 315, this court in the fifth paragraph of the syllabus said:

"While it is true that, as a general proposition, a defendant is entitled to a trial upon legal evidence alone, yet it is equally true that the admission of incompetent evidence which would not have prejudiced the defendant is not ground for reversal and constitutes harmless error."

In subdivision "b" of paragraph 5, of Rhea v. Territory, supra, this court stated:

"Although evidence may be improperly admitted against the defendant, on account of which a conviction would be reversed, yet, if the defendant takes the witness stand and testifies to the same thing, the error in receiving the other evidence will become harmless, and then will not be ground for reversal."

In this case the defendants in their testimony, in substance, admit all of the crimes and actions inquired of by the prosecution in the trial. No denial of any of the general facts gone into or attempted to be brought out by the state was made by the defendants, and the testimony clearly shows that from the time the defendants got together near Seminole after they were released from

the penitentiary they had in mind the robbing of a bank somewhere in the western part of the state; they started out with that purpose and continued their lawlessness until they did rob the Bank of Elgin, fled from the scene of the robbery, and secreted themselves in the home of Medrano, and when the deceased Wilson came to the home they shot him to death.

In White v. State, 34 Okla. Cr. 424, 246 Pac. 1114, in the second paragraph of the syllabus this court said:

"A judgment of conviction will not be reversed on the ground of improper admission or exclusion of evidence, unless after an examination of the entire record it appears that there has probably been a miscarriage of justice or a substantial violation of some constitutional or statutory right of the defendant."

In Rogers v. State, 9 Okla. Cr. 277, 131 Pac. 941, this court said:

"The admission or exclusion of testimony which, in the light of subsequent developments during the trial, indicates conclusively that no injury did or could have resulted is not ground for reversal of a judgment."

An examination of the record in this case shows that an effort on the part of the state to prove or inquire into certain facts, actions, and crimes of the defendant was not only immaterial but incompetent, and the trial court should have directed the prosecution to refrain from further seeking to bring out incompetent and immaterial facts, yet, in the light of the defendants' testimony wherein they admit all of the important and material facts in this case, except they urge they shot the deceased to keep from being killed, the admission or exclusion of the testimony, in the light of subsequent developments during the trial, did not prejudice the rights of the defendants, or deprive them of a fair and impartial trial.

In Ford et al. v. State, 23 Okla. Cr. 46, 212 Pac. 444, this court in the second and third paragraphs of the syllabus said:

"2. Before the court is authorized to reverse a judgment of conviction because of the improper admission of evidence, it is necessary that the court, after a consideration of the entire record, must be of the opinion that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right of the defendant.

"3. Where incompetent evidence is permitted to go before the jury, and such facts are otherwise proved in a competent manner, the error occasioned by the admission of the incompetent evidence becomes harmless."

In Maloon v. State, 38 Okla. Cr. 34, 259 Pac. 173, in the first paragraph of the syllabus this court said:

"An error in the rejection of evidence is not ground for a reversal, unless after an examination of the entire record it appears to this court that the same probably resulted in a miscarriage of justice or deprived defendant of a substantial right." Mayse v. State, 38 Okla. Cr. 144, 259 Pac. 277.

In State v. Walters, 105 Or. 662, 209 Pac. 349, the Supreme Court of Oregon in the first paragraph of the syllabus said:

"Where defendant and another committed several robberies, and, when accosted by the policeman searching for the guilty parties, defendant shot the policeman, and there was evidence that he had said he would not be taken, evidence of the robberies was admissible on a trial for murder, as tending to show motive."

The evidence in this case shows that one of the defendants, after they came to the Medrano house, stated in substance if not in exact language that he would shoot

the first officer that came in the house, and it is undisputed the defendants or one of them did shoot the first officer that entered the house.

It is clear from the record that the defendants fired the shot that took the life of the officer Wilson, in order to prevent an arrest by the officers of the law. The crime for which the defendants were being tried arose out of the robbery of the Bank of Elgin. The killing would not have occurred if the robbery of the bank had not been committed, as the defendants were pursued from the time of the robbing of the bank up to the time they arrived in the Medrano home, and the officers surrounded the house.

The record discloses that both the defendants were former convicts, and from the time they were released from the penitentiary had in mind robbing a bank; that when they left Seminole a few days before this robbery occurred, along the route they traveled they committed crime after crime until they reached the Bank of Elgin and robbed it, and then fled from the scene and took possession of the Medrano home and concealed themselves in the house, and followed it up by taking the life of Wilson, the deputy sheriff. The defendant's counsel ably defended them and did all they could to protect the rights of the defendants and save them from the electric chair.

The crime of which the defendants were charged was a cold-blooded murder, committed for the purpose of trying to escape from the charge of robbing a bank. Not a single mitigating circumstance appears in the record. No one attempts to justify or can justify the acts of the defendants. The record shows the defendants to be criminals of the vilest kind and character; men who did not hesitate to take the life of a party if from their viewpoint they deemed it necessary in order to make their

escape from the crime committed by them, for which the officers and posse were pursuing them.

It is needless, and would serve no useful purpose to prolong their opinion further; suffice it to say that the defendants were accorded a fair and impartial trial. Many improper questions are contained in the record, but after a careful consideration and study, we hold there are no reversible errors in the record.

The evidence is sufficient to sustain the charge of murder, and the sentence imposed on both of electrocution. The judgment is affirmed.

The original time for the execution having passed during the pending of this appeal, it is considered, ordered, and adjudged by this court that the judgment and sentence of the district court of Comanche county be carried out by the electrocution of the defendants by the warden of the state penitentiary, at McAlester, Okla., on Friday, June 11, 1937.

DOYLE and BAREFOOT, JJ., concur.